**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

DERRICK GORDON,

    Plaintiff,

v.                                                                      Case No. 3:09-cv-823-J-32JBT

LEONARD SCHLOFMAN, etc.,

    Defendant.

## ORDER

### I. Status

Plaintiff, an inmate of the Florida Department of Corrections, is proceeding in this action on a pro se Amended Complaint (Doc. #10) filed pursuant to 42 U.S.C. § 1983. Plaintiff claims that Defendant Leonard Schlofman, an optometrist contracted by the Florida Department of Corrections to treat inmates at several institutions, was deliberately indifferent to Plaintiff's serious medical needs, in violation of the Eighth Amendment.

This cause is before the Court on Defendant's Motion to Dismiss or in the Alternative Motion for Summary Judgment (Doc. #34) (hereinafter Defendant's Motion). The Court previously advised Plaintiff of the provisions of Fed. R. Civ. P. 56, notified him that the granting of a motion to dismiss or a motion for summary judgment would represent a final adjudication of this case which may foreclose subsequent litigation on the matter, and gave him an opportunity to respond. See the Court's Order (Doc. #12) at 3-4. Plaintiff has responded. See Plaintiff's Response to Defendant's Motion to Dismiss or in the Alternative

1

Motion for Summary Judgment  (Doc. #41) (hereinafter Response); Supplemental Brief in Support of Plaintiff's Motion for Leave to Proceed to Trial (Doc. #45).[1]

## II.  Plaintiff's Allegations

In his Amended Complaint, Plaintiff alleges the following pertinent facts to support his deliberate indifference claim.  In 1995, the Defendant diagnosed Plaintiff with open angle glaucoma, and prescribed Timonol Timoptic eye drops to treat the condition.

In 2000, Plaintiff discovered[2] that the Timonol Timoptic solution was causing severe side effects, including headaches, confusion, hallucinations and memory dysfunction. "The drug Timonol Timoptic was discontinued because after careful examinations it was determined that the plaintiff could have very well been experiencing symptoms of adverse reactions from the Timonol Timoptic, and not been aware until properly examined." Amended Complaint at 3.  The Defendant then prescribed Xalatan, which had been clinically proven to have less side effects.

On October 5, 2006, Plaintiff started experiencing blurred vision.  Additionally, "[t]he severe headaches along with [the] aforementioned symptoms were still in existence." Id. On the same day, Plaintiff requested that the Department of Corrections Health Services issue him glasses because his personal glasses were broken.  On December 19, 2006,

---

[1] Defendant has moved to strike this pleading, see Defendant's Motion to Strike Plaintiff's Supplemental Brief in Support of Plaintiff's Motion for Leave to Proceed to Trial (Doc. #46); however, the Court will deny this request.

[2] In the Amended Complaint, Plaintiff states that he made this discovery in 2008; however, in his Response at 3, Plaintiff notes that he made a typographical error and that this discovery actually occurred in 2000.

Plaintiff had an appointment with the Defendant "and was denied state issued glasses." Id. During this visit, Plaintiff mentioned that his glasses, which he had brought with him to the appointment, were broken.  "Dr. Schlofman rudely yelled and cursed about having told plaintiff before about his glasses and that if he asked again that he would be locked up." Id.

"In April 2007, Defendant Leonard Schlofman's conduct was even more so aggressive, he was verbally abusive toward plaintiff in front of staff members.  Defendant stated: 'I don't want to see anybody from Taylor (C.I.), [n]ext time don't be so fucking late. Re-schedule their ass.'" Id. at 4.  "At one point, on a separate occasion, defendant poked plaintiff in the chest as if provoking a fight." Id.  Plaintiff did not see the Defendant again from August 1, 2008, through the date the Amended Complaint was filed.

In April of 2009, Dr. Hiep Nyguen refused to prescribe the Xalatan eye drops that Plaintiff had been using "based on the determination by defendant that plaintiff no longer has glaucoma" and no longer requires treatment. Id.  Plaintiff "now suffers from loss of vision and side effects as a result of different medications prescribed by defendant to treat a glaucoma condition that the defendant avers no longer exist[s]." Id. at 5.  Plaintiff asserts that "timely and adequate treatment would have prevented nearly most of his vision loss and subsequent deterioration of his sight." Id.

### III. Standard of Review

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows

the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556).  "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Id. (citing Twombly, 550 U.S. at 555).

"Summary judgment is appropriate only if 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Moton v. Cowart, 631 F.3d 1337, 1341 (11th Cir. 2011) (quoting Fed. R. Civ. P. 56(a)).  "If the moving party meets this burden, 'the nonmoving party must present evidence beyond the pleadings showing that a reasonable jury could find in its favor.'"  Ekokotu v. Federal Exp. Corp., 408 Fed.Appx. 331, 333 (11th Cir. 2011) (per curiam) (not selected for publication in the Federal Reporter) (quoting Fickling v. United States, 507 F.3d 1302, 1304 (11th Cir. 2007)).

### IV.  Law and Conclusions

### A. Exhaustion of Administrative Remedies

Defendant contends that several claims should be dismissed[3] because Plaintiff failed to exhaust his available administrative remedies with respect to those claims.  See

---

[3] While the Defendant's Motion is supported by affidavits and other documents, it will not be construed as a motion for summary judgment with respect to the claims that are being decided on the basis of exhaustion.  See Bryant v. Rich, 530 F.3d 1368, 1374-75 (11th Cir. 2008) (noting that exhaustion of administrative remedies is a matter in abatement and not generally an adjudication on the merits; therefore, an exhaustion defense should be raised in motion to dismiss and treated as such if raised in a motion for summary judgment).

Defendant's Motion at 12-16. The Prison Litigation Reform Act (hereinafter PLRA) amended The Civil Rights of Institutionalized Persons Act, 42 U.S.C. § 1997e to read as follows:

> (a) Applicability of Administrative Remedies. No action shall be brought with respect to prison conditions under section 1979 of the Revised Statutes of the United States (42 U.S.C. 1983), or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

Exhaustion of available administrative remedies is "a precondition to an adjudication on the merits" and is mandatory under the PLRA. Bryant v. Rich, 530 F.3d 1368, 1374 (11th Cir. 2008); Jones v. Bock, 549 U.S. 199, 211 (2007); Woodford v. Ngo, 548 U.S. 81, 85 (2006) ("Exhaustion is no longer left to the discretion of the district court, but is mandatory.") (citation omitted). Furthermore, "the exhaustion requirement cannot be waived based upon the prisoner's belief that pursuing administrative procedures would be futile." Higginbottom v. Carter, 223 F.3d 1259, 1261 (11th Cir. 2000) (per curiam) (citing Alexander v. Hawk, 159 F.3d 1321, 1323 (11th Cir. 1998)).

The Florida Department of Corrections provides a three-step grievance procedure. First, an inmate must normally submit an informal grievance "to the staff member who is responsible in the particular area of the problem." See Chapter 33-103.005(1) of the Florida Administrative Code (hereinafter F.A.C.). If the issue is not resolved or the inmate receives no response to the informal grievance within the time allotted, the inmate must then file a formal grievance at the institutional level. See Chapter 33-103.006, F.A.C.; Chapter 33-103.011(4), F.A.C. If the matter is not resolved at the institutional level or the inmate

5

receives no response to the formal grievance within the time allotted, the inmate must file an appeal to the Office of the Secretary of the Florida Department of Corrections. See Chapter 33-103.007, F.A.C.; Chapter 33-103.011(4), F.A.C. However, an inmate may bypass the first step of this grievance procedure if his grievance concerns medical issues and file a formal grievance directly at the institutional level. See Chapter 33-103.006(3)(e), F.A.C.

Upon review of Plaintiff's grievances and his properly filed appeals to the Secretary,[4] this Court agrees with Defendant's contention that Plaintiff failed to exhaust some of his claims. Specifically, he did not exhaust any claims regarding the alleged side effects and/or inadequacy of his glaucoma medications or his claim that Dr. Nyguen refused to prescribe Xalatan eye drops based on the Defendant's alleged finding that Plaintiff no longer has glaucoma. See Ex.[5] C6; Ex. C11; Ex. D. Thus, the Defendant's Motion will be granted to the extent that the unexhausted claims identified above will be dismissed pursuant to 42 U.S.C. § 1997e(a).[6]

---

[4] Administrative law requires proper exhaustion of administrative remedies, which "means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits)." Woodford, 548 U.S. at 90 (quoting Pozo v. McCarthy, 286 F.3d 1022, 1024 (7th Cir. 2002)). Thus, the appeals that Plaintiff submitted to the Secretary that were rejected for Plaintiff's failure to comply with the grievance procedure of the Florida Department of Corrections do not serve to exhaust the claims raised therein.

[5] The Court hereinafter refers to the exhibits appended to Defendant's Motion as "Ex."

[6] Defendant also asserts that this case should be dismissed as a sanction for Plaintiff's failure to disclose his prior federal cases in his Amended Complaint. See Defendant's Motion at 17. This Court is of the opinion that dismissal on this basis is not warranted and that it is most appropriate to dispose of the remainder of Plaintiff's claims by summary judgment.

## B. Defendant's Motion for Summary Judgment

Defendant denies that he was deliberately indifferent to Plaintiff's serious medical needs. "To show that a prison official acted with deliberate indifference to serious medical needs, a plaintiff must satisfy both an objective and a subjective inquiry." Brown v. Johnson, 387 F.3d 1344, 1351 (11th Cir. 2004) (quoting Farrow v. West, 320 F.3d 1235, 1243 (11th Cir. 2003)). First, the plaintiff must satisfy the objective component by showing that he had a serious medical need. Goebert v. Lee County, 510 F.3d 1312, 1326 (11th Cir. 2007). As noted by the Eleventh Circuit:

> "A serious medical need is considered 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" Id. (citing Hill v. Dekalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1187 (11th Cir. 1994)). In either case, "the medical need must be one that, if left unattended, pos[es] a substantial risk of serious harm." Id. (citation and internal quotations marks omitted).

Brown, 387 F.3d at 1351.

To satisfy the subjective component, a plaintiff must show that the prison official acted with deliberate indifference to his serious medical need. Goebert, 510 F.3d at 1326. To do so a plaintiff must prove the following:

> "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than [gross] negligence." Bozeman v. Orum, 422 F.3d 1265, 1272 (11th Cir. 2005) (alteration in original) (internal quotation marks omitted). Although we have occasionally stated, in dicta, that a claim of deliberate indifference requires proof of "more than mere negligence," McElligott v. Foley, 182 F.3d 1248, 1255 (11th Cir.

7

> 1999), our earlier holding in Cottrell, 85 F.3d at 1490[7], made clear that, after Farmer v. Brennan, 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994), a claim of deliberate indifference requires proof of more than gross negligence.

Townsend v. Jefferson County, 601 F.3d 1152, 1158 (11th Cir. 2010).

The record reflects the following with respect to Plaintiff's medical condition and care. In 1995, the Defendant diagnosed Plaintiff with open-angle glaucoma and prescribed Timonol Timoptic eye drops twice a day in both eyes. Ex. B at 2. "Open-angle glaucoma is the most common form of glaucoma and is generally characterized by increased pressure in the eye." Id. "Timoptic is a beta-blocker eye drop solution that is used to lower the pressure in the eyes. It is contraindicated for patients with heart conditions or breathing problems, such as asthma, emphysema, or COPD to take beta blockers." Id. At the time the Defendant prescribed this medication, Plaintiff denied having a history of such conditions. Id. Plaintiff's prescription for Timonol Timoptic eye drops continued until his release from prison on May 17, 1996.[8] Id. at 2-3.

Plaintiff returned to the custody of the Florida Department of Corrections on July 15, 1999. In his affidavit, Defendant Schlofman describes his subsequent treatment of Plaintiff:

> I first saw Gordon since his return to DOC custody on April 3, 2000, for another Visual Fields Analysis test. (Exhibit 11)[9]  The test results were within normal limits, indicating that

---

[7] Cottrell v. Caldwell, 85 F.3d 1480 (11th Cir. 1996).

[8] In his Amended Complaint, Plaintiff alleges that he continued to use the Timonol Timoptic eye drops after he was released from prison.

[9] Defendant cites to the thirty-eight exhibits appended to his affidavit (Ex. B).

Gordon continued to show no loss of vision due to his glaucoma. (Exhibit 11)

On April 5, 2000, Gordon was seen by Dr. McAuliffe, an eye surgeon in Jacksonville, Florida. (Exhibit 12) Dr. McAuliffe performed a Gonioscopy test on Gordon, which is another type of test used to monitor glaucoma patients. (Exhibit 12) During this visit, Gordon reported shortness of breath to Dr. McAuliffe and it was recommended that Gordon's medication be switched to Xalatan. (Exhibit 12) Xalatan is a non-beta-blocker solution that also works to lower the pressure in the eye.

On May 9, 2000, Gordon returned for a follow-up visit. (Exhibit 13) His pressures were normal at 18 in both eyes. (Exhibit 13) I agreed with the change in medication from Timoptic to Xalatan based on Gordon's reported shortness of breath when he saw Dr. McAuliffe. Gordon never complained of shortness of breath or any other issues to me while using Timoptic.

I continued to see Gordon approximately every six months to check his eye pressure and to follow up on his condition. I saw Gordon on the following dates: November 3, 2000; July 13, 2001; February 15, 2002; August 19, 2002; and, February 14, 2003. (Exhibits 14, 15, 16, 17 & 18) Gordon's condition remained stable with normal pressures in both eyes, and at each visit I recommended that he remain on the Xalatan medication to control the pressure in his eyes. (Exhibits 14, 15, 16, 17 & 18)

On June 12, 2003, Gordon saw Dr. John Tugwell to be evaluated for a new eyeglass prescription. (Exhibit 19) Gordon received his new glasses on July 3, 2003. (Exhibit 19) I saw Gordon for a follow-up visit on August 22, 2003, and ordered a new Visual Field Analysis. (Exhibit 20) His pressures were had [sic] lowered to 14 in both eyes. (Exhibit 20)

A Visual Field Analysis was performed on October 24, 2003, and again on April 18, 2004. (Exhibits 21 & 22) The results of both tests were within normal limits and again showed that Gordon has suffered no loss of vision as a result of his glaucoma. (Exhibits 21 & 22)

9

I continued to see Gordon approximately every six months to continue [to] check his eye pressure and to monitor his condition. I saw Gordon on June 11, 2004, January 24, 2005, and July 25, 2005. (Exhibits 23, 24 & 25) His condition remained stable and I again prescribed Xalatan. (Exhibits 23, 24 & 25) I also noted that his visual field continued to be within normal limits. (Exhibit 25)

Gordon's next follow-up appointment was on December 19, 2005. (Exhibit 26) His pressures were 18 and 20. (Exhibit 26) Gordon reported that he was "on and off" his medication and that he was not using the Xalatan solution as instructed. (Exhibit 26) I went over the instructions with Gordon again, telling him to use one drop at night in each eye and to let the medication soak in. (Exhibit 26)

Gordon returned for a follow-up visits on February 6, 2006, and September 18, 2006. (Exhibits 27 & 28) His pressures were much better and he was instructed to continue taking the Xalatan medication as directed. (Exhibits 28 & 28) In September 2006, I ordered another Visual Field Analysis test for Gordon to check the progression of his condition. (Exhibit 28)

Gordon was scheduled for the Visual Field Analysis on December 8, 2006. (Exhibit 29) He was not seen due to time constraints and his appointment was rescheduled. (Exhibit 29) Based on my review of Gordon's medical records, Gordon was seen in the Chronic Clinic on December 19, 2006, at his institution and stated he was upset with me because I would not order him new glasses and his old pair was broken. (Exhibit 30) I was frustrated with Gordon in December 2006 because he repeatedly asked me to repair his broken personal glasses, which is contrary to Department policy. I had explained the policy on personal glasses to Gordon on several prior occasions and he continued to ask me about it. While I did decline to repair his personal glasses in accordance with policy, at no time have I denied Gordon prescription glasses or intimidated him into not requesting them as needed.

During this time, Taylor Correctional Institution had privatized healthcare services which operated like an HMO. In order for the private healthcare company to properly pay the

Reception and Medical Center for my services, an inmate had to be specifically referred to me to be evaluated for glasses. Thus, if the consultation request specified that Gordon was to see me for a regular 6-month check of his glaucoma, I could not evaluate him for glasses during the same visit unless I was directed to do so, even if Gordon reported to me that his glasses were broken, lost or stolen. Gordon had to first see medical and be called out to have his eyes evaluated at the institution. If necessary, the provider would then write a consultation for him to have his eyes checked and evaluated for glasses at RMC. Thus there may have been a short period of time between when Gordon's glasses broke and when he was able to be evaluated for a new prescription; however, being without glasses would not affect his glaucoma or his vision. Gordon's vision has always been correctable to 20/20.

The rescheduled Visual Field Analysis was completed on March 5, 2007. (Exhibit 31) The results of Gordon's visual field test continued to be within normal limits and showed no loss of vision. (Exhibit 31)

Gordon was scheduled to be evaluated for a new eyeglass prescription on April 13, 2007. (Exhibit 32) He was not seen due to time constraints and his appointment was rescheduled. (Exhibit 32) At no time, during this visit or otherwise, have I been verbally or physically abusive to Gordon. There was an issue in April 2007 where inmates were arriving very late from Taylor Correctional Institution; however, this is was [sic] an issue with the institution, not with Gordon personally.

On May 21, 2007, I evaluated Gordon for a new eyeglass prescription. (Exhibit 33) He stated his last state-issued glasses were stolen and his personal glasses were broken. (Exhibit 33) Gordon received his new glasses on June 17, 2007. (Exhibit 33)

On June 11, 2008, I saw Gordon for a recheck of his eye pressures. (Exhibit 34) Gordon reported that he had not used the Xalatan drops in 1 ½ months; however, his pressures were normal at 14 and 11. (Exhibit 34) I recommended he continue with the Xalatan drops and ordered a GDX test for Gordon. (Exhibit 34)

GDX is a relatively new test available to glaucoma patients which measures damage to the fibers in the optic nerve. Prior to the GDX becoming available, patients often found that they had glaucoma after noticing loss of vision. GDX allows for earlier detection of glaucoma before the patient would show any changes in his or her visual field.

A GDX was performed on Gordon on November 10, 2008. (Exhibit 35) The results were within normal limits and indicated that Gordon has no damage to his optic nerve. (Exhibit 35)

Gordon had a follow-up appointment scheduled on February 17, 2009. (Exhibit 36) Gordon refused to be seen. (Exhibit 36) In addition, Gordon refused to take the Xalatan medication that had been prescribed to treat his glaucoma. (Exhibit 36) My review of the records indicates that Gordon also refused to sign the refusal form; however, his refusal was witnessed by a correctional officer and the nursing supervisor at his institution. (Exhibit 36) In addition, the record reflects that the risk of blindness associated with refusing his medication was explained to him and he still refused it. (Exhibit 36)

I last saw Gordon for a follow-up appointment on September 1, 2009. (Exhibit 37) At that time, Gordon reported that the only medication he was taking was Remeron. (Exhibit 37) His pressures were normal at 13 and 14. (Exhibit 37) He was also evaluated for new glasses, which he received on September 25, 2009. (Exhibit 37)

On the September 1, 2009, consult request, it is noted that Gordon's recent GDX was within normal limits and then states "no treatment per Dr. Schlofman." (Exhibit 37) This means that because the GDX was normal, no additional treatment or additional GDX testing was needed at that time.

On April 14, 2010, Gordon refused an appointment at the Eye Clinic to check on a previous complaint of redness, pain and swelling in his left eye and blurred vision. (Exhibit 38)

. . . .

> Gordon also alleges in his Amended Complaint that he has been experiencing headaches, burning in his eyes, partial vision loss, confusion, hallucinations, and memory dysfunction due [to] the medications prescribed by me to treat his glaucoma. I have only ever prescribed Timoptic and Xalatan to treat Gordon's glaucoma. Gordon has never reported any such symptoms to me. If he had, it would have been included in my consult report.

Ex. B at 4-9 (paragraph enumeration omitted).

This Court finds that the Defendant has met his initial burden of showing this Court, by reference to his affidavit and Plaintiff's medical records which support the assertions in the Defendant's affidavit, that there are no genuine issues of material fact that should be decided at trial. There appears to be no dispute that Plaintiff's glaucoma constitutes a serious medical need.[10] However, the Defendant has presented evidence that, during the pertinent time frame, he took appropriate action in response to that need.[11]

---

[10] Insofar as Plaintiff complains that the Defendant denied him glasses, such a claim does not rise to the level of an Eighth Amendment violation because "being without glasses would not affect his glaucoma or his vision." Ex. B at 7. Even assuming the temporary denial of glasses rises to the level of an Eighth Amendment violation, the provision of glasses was not within the Defendant's purview unless a provider at the institution sent a consultation request, asking the Defendant to evaluate Plaintiff for glasses. See id. at 6; Ex. E. A consultation, dated February 1, 2007, was sent to the Reception and Medical Center Optometry Department, requesting that Plaintiff be evaluated for glasses. The Defendant evaluated Plaintiff on May 21, 2007, and wrote a prescription for Plaintiff's glasses the same day. Plaintiff received his glasses on June 17, 2007. See Ex. B33. These circumstances do not support a deliberate indifference claim against the Defendant.

[11] To the extent Plaintiff contends that he is being denied treatment for glaucoma based on the Defendant's finding that Plaintiff no longer has glaucoma, Plaintiff has failed to present any evidence that the Defendant made such a finding. In fact, Plaintiff's own exhibit demonstrates that as of February 18, 2011, the Defendant opined that Plaintiff has glaucoma and it would be prudent for Plaintiff to continue treatment for the disease. See Supplemental Brief in Support of Plaintiff's Motion for Leave to Proceed to Trial (Doc. #45), Exhibit A at 4-5. Plaintiff apparently surmises that the Defendant made a finding that Plaintiff

Because Defendant has met this initial burden, Plaintiff is required to present his own documentation (affidavits, depositions, answers to interrogatories, admissions on file, etc.) to show that there is a genuine issue for trial. Plaintiff must demonstrate that the Defendant's responses to his medical need were poor enough to constitute an unnecessary and wanton infliction of pain, and not merely accidental inadequacy, negligence in treatment, or even medical malpractice actionable under state law. Taylor v. Adams, 221 F.3d 1254, 1258 (11th Cir. 2000) (citing Estelle v. Gamble, 429 U.S. 97, 105-06 (1976)). Plaintiff has failed to provide any evidence to support a claim of negligence, let alone his Eighth Amendment claim of deliberate indifference.

Therefore, it is now

**ORDERED:**

1. Defendant's Motion to Strike Plaintiff's Supplemental Brief in Support of Plaintiff's Motion for Leave to Proceed to Trial (Doc. #46) is **DENIED.**

2. Defendant's Motion to Dismiss or in the Alternative Motion for Summary Judgment (Doc. #34) is **GRANTED** to the extent that: Plaintiff's claim that Dr. Nyguen

---

no longer has glaucoma based on a medical record entry that states, "no treatment per Dr. Schlofman." Ex. D37. However, as noted above, the Defendant explained that entry means no additional treatment or additional GDX testing was needed at that time because the GDX test was normal. Thus, insofar as Plaintiff asserts that Dr. Nyguen or anyone other than the Defendant has failed to properly treat his glaucoma because they misunderstood that entry, Plaintiff must raise such a claim in a separate lawsuit, after exhausting his available administrative remedies. Additionally, to the extent Plaintiff asserts the Defendant has failed to properly treat him at any time after the Amended Complaint was filed, Plaintiff would have to raise such a claim in a separate case after exhausting his available administrative remedies.

refused to prescribe Xalatan eye drops based on the Defendant's alleged finding that Plaintiff no longer has glaucoma and Plaintiff's claims regarding the alleged side effects and/or inadequacy of his glaucoma medications are **DISMISSED** for Plaintiff's failure to exhaust these claims; and summary judgment is entered in favor of the Defendant with respect to the remainder of Plaintiff's claims.

3. The Clerk shall enter judgment accordingly and close this case.

**DONE AND ORDERED** at Jacksonville, Florida this 11th day of July, 2011.

_____
TIMOTHY J. CORRIGAN
United States District Judge

ps 6/30
c:
Derrick Gordon
Counsel of Record